**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

THOMAS CONROY,                       :
                                     :    Civil Action No. 05-3792 (PGS)
                 Petitioner,         :
                                     :
        v.                           :    OPINION
                                     :
CHARLES C. LEONE, et al.,            :
                                     :
                 Respondents.        :


**APPEARANCES:**

Petitioner pro se                    Counsel for Respondents
Thomas Conroy                        Annmarie Cozzi
Bayside Prison                       Bergen Co. Prosecutor's Ofc.
P.O. Box F-1                         Bergen Co. Justice Center
Leesburg, NJ 08327                   Hackensack, NJ 07601

**SHERIDAN**, District Judge

    Petitioner Thomas Conroy, a prisoner currently confined at

Bayside State Prison in Leesburg, New Jersey, has submitted a

petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254.  The respondents are Charles C. Leone, Peter C. Harvey,

and John L. Molinelli.

    For the reasons stated herein, the Petition must be denied.

I.   BACKGROUND

A.   Factual Background

The relevant facts are set forth in the opinion of the Superior Court of New Jersey, Appellate Division.[1]

> Defendant's convictions arise from the armed robberies of Margaret Madden and Helen Imperatore at the Imperatore mansion in Fort Lee, New Jersey on June 1, 1998.  Madden was Imperatore's friend and house assistant and she was living in the Imperatore home.  She testified that, about 9:30 p.m., Imperatore retired to her upstairs bedroom.  Madden remained on the first floor watching television when two men, wearing stockings on their heads and gloves on their hands, entered the room and grabbed her by the throat.  The intruders threatened to kill Madden if she did not tell them where the money was.  Madden said that one of the intruders had a knife.
>
> Madden testified that both men spoke with New York or New Jersey accents.  One of the men was taller than the other.  Madden said that, from their speech, she determined that the intruders were white.  Madden testified that the intruders repeatedly asked where the money was and she replied that there was no money in the house.  One of the intruders began to rifle through the drawers and the bureaus in Madden's bedroom.  The other intruder remained with Madden, his arm around her throat.  The men took about $25 from Madden's purse.
>
> Madden was asked whether there was anyone else in the house and Madden told the intruders that Imperatore was upstairs.  Because she had arthritis in her knees, Madden had difficulty walking up stairs.  The men carried Madden to the second floor and she directed them to Imperatore's bedroom.  Imperatore awoke and

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

observed the intruders.  Imperatore testified that both
men had knives, were wearing black clothes and had
stockings over their heads and gloves on their hands.

Imperatore stated that she stood within two feet
of the shorter of the two intruders, who was about 5'7"
tall.  She noticed the shape of his head.  She said
that he had short hair and bad teeth.  Imperatore also
said that she was able to see the short intruder's
girth, height and profile.  She testified that she had
identified Mark Vassos as the shorter intruder at a
prior proceeding.  Imperatore stated that she was able
to do so by looking at the shape of his head, his
height, his weight and his demeanor.  She testified,
"Just looking at him and having been with him for ...
half an hour, you get to know -- kind of get to know a
person."

Imperatore also asserted that the other intruder
was about 6' to 6'1" tall and weighed about 200 pounds.
Imperatore did not get a good look at him.  She said
that she saw Kyriazis in a prior proceeding and he
looked "very similar" to the taller of the two
intruders.  Imperatore testified that she never saw
defendant in her house.

The two men threatened to kill the women if they
did not reveal where the money was located.  Imperatore
told the men that she had $500 in $100 bills in a
drawer in her dressing room.  The men took that money
and ransacked Imperatore's bedroom, eventually taking
jewelry later valued at about $90,000.  The intruders
demanded more money and Imperatore told them that there
was more to be found in another dresser.  Imperatore
had been saving money for her grandchildren, all in
$100 bills.  The men took the money, which totaled
about $170,000.  They also took some of Madden's
jewelry.  They placed the money and the jewelry in a
blue bag, tied the women's hands, told them not to make
any noise, and left the house.

Imperatore freed herself, freed Madden and called
the police who responded to the scene.  Detective James
Hunt of the Fort Lee police department was assigned to
coordinate the investigation.  After speaking with the
police, Imperatore agreed to offer a reward of $10,000
for the arrest of the persons who committed the
robberies.

On June 2, 1998, at about 5:00 p.m., information about the robberies at the Imperatore home and the reward was broadcast on the evening news. About a half-hour later, Detective Hunt received a call from a person who identified himself as George Kyriazis, the brother of co-defendant Nicholas Kyriazis. George expressed an interest in the reward. Based on information provided by George, teams of police officers were dispatched to 29 Spring Street in Bloomfield and to a pawn shop/jewelry store called "Creations Between Us" in Newark.

Trifon Nomidis owned and worked at the store. He testified that about 1:00 p.m. on June 2, 1998, he received a call from Nicholas Kyriazis, who said that he wanted to come over to the store. Later, Kyriazis arrived by himself in a green sports car, which Nomidis identified as the Dodge Stealth. Nomidis said that Kyriazis was carrying a blue bag. Imperatore and Madden identified the blue bag as the same bag the intruders had with them at the time of the robberies.

Kyriazis told Nomidis that he and his friends had done a "job" the prior night with his friends. Kyriazis said that he and the man with a Greek surname named Mark entered a mansion in Fort Lee, pulled a knife on two elderly women and robbed them. Kyriazis' pockets were full of money. He told Nomidis that the mastermind of the robberies was a friend who was a paralegal studying to become a lawyer and the owner of the green Dodge Stealth. Kyriazis said that a woman had driven the get-away car. The three men each had received $80,000 in cash from the robbery and they paid the driver of the get-away car $20,000.

Kyriazis asked Nomidis to value the jewelry that was stolen in the robbery. Fearing that they would be overheard by another employee in the store, Nomidis led Kyriazis next door to the basement of an adjoining building that he owned at 61 Halsey Street. There, Kyriazis emptied the blue bag on the table. Kyriazis asked Nomidis to separate the costume jewelry from the "real" jewelry.

Nomidis brought the "real" jewelry back to his store in a brown paper bag and he left the costume jewelry in the blue bag at 61 Halsey Street. Kyriazis left. When the store closed for the evening, Nomidis

4

began to weigh the gold and "gauge" the stones.  After he weighed each item, he placed each piece in a separate bag.  When he became weary, he placed the remaining pieces in bags and placed those bags in the brown paper bag.  At about 5:45 p.m., Nomidis went to lock the gates on the store and he was approached by the police.

The police showed Nomidis photos of the jewelry stolen from the Imperatore home.  He acknowledged that some of the pieces were in the store and that he had been asked to weigh and appraise the jewelry.  Nomidis executed a form consenting to the search of the store. The jewelry was seized.  Meanwhile, Nomidis observed Kyriazis pass by in the green Dodge Stealth.  Shortly thereafter, Kyriazis called and asked Nomidis, "What's wrong?"  Nomidis replied, "You know what's wrong." Nomidis told the police about the blue bag in the building at 61 Halsey Street.  Nomidis executed a form consenting to a search of those premises.  The police entered the building and seized the blue bag, which was on the stairs leading up from the basement.  The police did not open the bag until a search warrant had been obtained.  The bag was found to contain costume jewelry, a shawl as well as Imperatore's dental appointment card.  At trial, Imperatore identified the jewelry and the other items and said that they were stolen during the robberies.[fn2]

> [fn2] Nomidis was arrested and pled
> guilty to third-degree receiving stolen
> property.  He agreed to testify against
> defendant and the others indicted for the
> robberies at the Imperatore home.

Later in the evening of June 2, 1998, Detective Hunt and the team of police officers conducting surveillance at 29 Spring Street in Bloomfield observed a green Dodge Stealth occupied by three men pass by. The officers stopped the car.  Kyriazis was a passenger in the front seat.  Kyriazis' nephew George Roman was in the rear passenger seat and defendant was the driver.  The police searched the vehicle and, in the glove compartment, found $39,900, all in $100 bills. Thirteen and one-half Xanax tablets also were found in the glove compartment.  Two knife cases were found in the car but there were no weapons.  The officers searched Kyriazis and found $580, including five $100

5

bills, and several glassine envelopes containing heroin.  Hunt noted in his arrest report that Kyriazis was 6'1" tall and weighed 210 pounds.

Defendant consented to a search of his apartment at 40 West 20th Street in Bayonne, New Jersey.  There, the officers found pearl-colored stones, clear-colored stones and a gold chain.  The pearl-colored stones came from a bracelet that had been stolen during the robberies.  The police also found a canvas laundry bag in a closet.  The police turned the bag upside down and found several articles of clothing, including a black tee shirt and black pants that had "green, bushy, burr" material on them.  The initials "N.K." were on three articles of clothing.  Lieutenant Leonard Cottrell testified that the burrs were similar to materials he observed when he walked along the side of the Imperatore house after the robberies.

Simone DeMarco also testified.  She had been Vassos' girl friend.  She stated that, after the robberies, Vassos told her that he, Kyriazis and defendant had participated in the robberies at the Imperatore home.  Vassos said that, while defendant waited in his green Dodge Stealth, he and Kyriazis entered the home, spoke with a maid and then met the "lady of the house" in her bedroom.  Vassos said that they took money and jewelry and tied up the victims with pantyhose.  After the robberies, the three men went to defendant's apartment where they divided the cash.

Vassos asked for DeMarco's help in finding a safe hiding place.  DeMarco found Vassos a room in a hotel in New York City.  On June 12, 1998, the police arrived looking for Vassos.  DeMarco gave the police the address of the hotel where Vassos was staying.  Vassos was arrested and, among the items seized in his hotel room, were a black shirt, a receipt indicating that Vassos spent $900 in cash at a clothing store, a card with Kyriazis' phone number, and a card from a diner where Maria Serrano worked.  Detective Frank Cox of the Fort Lee police department participated in the arrest. He described Vassos as being 5'5" to 5'6" tall, and weighing 160 to 165 pounds.[fn3]

[fn3] DeMarco was arrested for possession of CDS.  She pled guilty and, at the time of

6

trial, she was awaiting sentence.

Jose Saavedra testified that he met DeMarco while she was a customer in a store where Saavedra worked. They used to go out "once in a while."  On or about June 16, 1998, DeMarco handed Saavedra a bag and asked him to hold it for her.  Saavedra said the bag contained $4,600 in $100 bills.  He "borrowed" $2,000 and went on a vacation.  Upon his return, Saavedra was informed that the money had been stolen.  He paid back the money he had "borrowed" and turned in the remaining cash to the police.

Detective Kenneth Porrino questioned defendant on June 3, 1998.  Defendant denied that he was involved in the Imperatore robberies.  However, defendant said he knew some people who were guilty.  Defendant told Porrino that he did not know Kyriazis but he had given him a ride in his car.  He denied any knowledge about the money that was found in his car.

Jennifer Vassos testified that, in June 1998, she was living in Bloomfield with her uncle, defendant Mark Vassos, her mother Diane O'Shea and her father Richard Vassos.  She stated that she saw defendant and Maria Serrano with Mark Vassos in May 1998.  Jennifer stated that on May 31, 1998, Serrano and Vassos picked up Kyriazis at Penn Station and brought him to her house. Kyriazis had clothes in a canvas bag which was identified as the same bag found in the search of Conroy's apartment.  Later that day, defendant arrived at Jennifer's house and he left with Serrano, Vassos and Kyriazis.  On June 1, 1998, Jennifer saw Kyriazis with Vassos in the early evening at her home.  The two men left.  The following morning, Vassos gave Jennifer's mother $4,000 in cash and he gave Jennifer $1,000 in $100 bills.  On June 3, Vassos gave Jennifer an additional $150.[fn4]

> [fn4] Jennifer Vassos pled guilty on May 24,
> 2001 to an unrelated burglary.  She expected
> to be sentenced to 364 days pursuant to her
> plea agreement.

Susan Cannon was employed at a dentist's office in Bayonne.  She testified that, on June 2, 1998, defendant came to the office and paid an outstanding bill of $845, in part with eight $100 bills.  Defendant

also gave Cannon $1,000 in $100 bills.  This payment was to be applied to future dental work.  Cannon also testified that, in the past, defendant had made cash payments of $100 and $400.

Michael Viola was an interior renovator and he worked with defendant.  Viola testified that, one day, while working in Fort Lee, Viola took defendant to lunch.  After lunch, they drove around the area and passed the Imperatore home.  Viola mentioned that Imperatore's husband owned several businesses in the area.

Defendant presented three witnesses on his behalf: Louis Santiago, Ann Minervini and Gloria Kyriazis. Santiago is the office manager at A&C Bus Company.  He testified that defendant worked for the company from August 1997 to June 1998.  Defendant worked from 6 a.m. to 9:30 a.m. and then from 2:30 p.m. to 6:30 p.m.  In between his shifts, defendant worked for Minervini. Santiago said that defendant worked for the bus company on June 2, 1998.

Minervini testified that on June 2, 1998, defendant worked for her at an apartment building that she managed in Jersey City.  Minervini stated that she sometimes paid defendant in cash with $100 bills. Minervini asserted that defendant took business courses at a community college and, to her knowledge, he was not a law student or a paralegal.  Minervini also said that she was aware that defendant drove a Dodge Stealth and she asserted that, at times, defendant let others use his car.

Gloria Kyriazis, wife of co-defendant Nicholas Kyriazis, testified that she had seen George Kyriazis taking medication.  She said the medication was Xanax.

(Resp. Ex. 4, Opinion of Superior Court of New Jersey, Appellate Division, at 3-14.)

B.    Procedural History

Following a jury trial, after the separate trials and convictions of his co-defendants Nicholas Kyriazis and Mark

Vassos, Petitioner was convicted in the Superior Court of New Jersey, Law Division, Bergen County, of conspiracy to commit armed robbery, second degree, contrary to N.J.S.A. 2C:5-2 and 2C:15-1, conspiracy to commit armed burglary, second degree, in violation of N.J.S.A. 2C:5-2 and 2C:18-2, conspiracy to commit theft, second degree, in violation of N.J.S.A. 2C:5-2 and 2C:20-3, dealing in stolen property, second degree, contrary to N.J.S.A. 2C:20-7.1(b), conspiracy to deal in stolen property, second degree, in violation of N.J.S.A. 2C:5-2 and 2C:20-7.1(b), and receipt of stolen property, second degree, contrary to N.J.S.A. 2C:20-7. The judge granted the State's motion to sentence Petitioner to an extended term as a persistent offender and sentenced Petitioner to an aggregate term of 23 years imprisonment, with seven and one-half years parole ineligibility.

By Opinion filed February 28, 2005, the Superior Court of New Jersey, Appellate Division, affirmed the conviction and sentence. (Resp. Ex. 4.) On May 25, 2005, the Supreme Court of New Jersey denied certification. (Resp. Ex. 7.)

This Petition followed. Respondents have answered and this matter is now ready for disposition.

## II.  28 U.S.C. § 2254

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254 now provides, in pertinent part:

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

With respect to any claim adjudicated on the merits in state court proceedings, the writ shall not issue unless the adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determinated by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (O'Connor, J., for the Court, Part II). A state court decision "involve[s] an unreasonable application" of federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," and may involve an

10

"unreasonable application" of federal law "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," (although the Supreme Court expressly declined to decide the latter).  Id. at 407-09.  To be an "unreasonable application" of clearly established federal law, the state court's application must be objectively unreasonable. Id. at 409.  In determining whether the state court's application of Supreme Court precedent was objectively unreasonable, a habeas court may consider the decisions of inferior federal courts. Matteo v. Superintendent, 171 F.3d 877, 890 (3d Cir. 1999).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference.  Chadwick v. Janecka, 302 F.3d 107, 116 (3d Cir. 2002) (citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)).  With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment.  See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

The deference required by § 2254(d) applies without regard

11

to whether the state court cites to Supreme Court or other federal caselaw, "as long as the reasoning of the state court does not contradict relevant Supreme Court precedent." Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (citing Early v. Packer, 537 U.S. 3 (2002); Woodford v. Visciotti, 537 U.S. 19 (2002)).

Although a petition for writ of habeas corpus may not be granted if the Petitioner has failed to exhaust his remedies in state court, a petition may be denied on the merits notwithstanding the petitioner's failure to exhaust his state court remedies. See 28 U.S.C. § 2254(b)(2); Lambert v. Blackwell, 387 F.3d 210, 260 n.42 (3d Cir. 2004); Lewis v. Pinchak, 348 F.3d 355, 357 (3d Cir. 2003).

Finally, a pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972). A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).

12

### III.    ANALYSIS

A.    Prosecutorial Misconduct

Petitioner contends that the prosecutor deprived him of liberty without due process by (1) failing to disclose a conversation between police officers and Ms. Imperatore in which police officers advised Ms. Imperatore that Petitioner was involved in the robberies, which Petitioner characterizes as a violation of the Brady rule, indicating impermissible suggestivity in the identifications of co-defendants Vassos and Kyriazis, and a violation of sequestration, (2) eliciting from Detective Leonard Cottrell perjurious testimony about the burrs found on clothing in Petitioner's apartment and improper expert testimony about the similarity of those burrs to burrs found on vegetation growing at the Imperatore home, (3) excessive use of leading questions, and (4) introduction of evidence of co-defendants' criminal activities, including drug use.

The Appellate Division rejected all of Petitioner's claims.

> Defendant additionally asserts that the judge in
> the Vassos trial erred in failing to conduct a hearing
> pursuant to United States v. Wade, 388 U.S. 218, 87
> S.Ct. 1926, 18 L.Ed.2d 1149 (1967),[2] before allowing
> Imperatore to testify at trial and identify Vassos as
> one of the two intruders who committed the robberies at
> her home on June 1, 1998.  However, defendant never
> objected to the admission of the identification

---

[2] United States v. Wade, 388 U.S. 218 (1967) (where an accused was not represented by counsel in post-indictment line-up identification procedure, accused is entitled to hearing to determine whether identification procedure was so tainted that in-court identification should be suppressed).

13

testimony in this case and never asked for a <u>Wade</u> hearing. In any event, in Vassos' appeal we rejected his argument that a <u>Wade</u> hearing was required and we reject it here. Vassos had not made a threshold showing that Imperatore's identification was the result of impermissive suggestiveness and, therefore, a <u>Wade</u> hearing was not required. <u>State v. Rodriguez</u>, 264 N.J. Super. 261, 269 (App. Div. 1993), <u>aff'd o.b.</u>, 135 N.J. 3 (1994).

(Resp. Ex. 4, Opinion of Appellate Division, at 34.)

Defendant also argues that the prosecutor elicited false and perjured testimony from Lieutenant Cottrell, who testified that he found burrs on the black shirt and pants found in the laundry bag in defendant's apartment that were similar to those he noticed when he walked around the Imperatore home. At the suppression hearing, defense counsel asserted that there were no burrs in the laundry bag. However, at trial, there were burrs on the clothes. Defendant notes that, in his report, Lieutenant Cottrell made no mention of the burrs although he testified that he did compare the burrs found at the Imperatore home with those in the laundry bag.

We find no merit in defendant's assertion that Lieutenant Cottrell "planted" the burrs on the clothes. Although defense counsel stated at the suppression hearing that there were no burrs on the clothes, the statements of an attorney are not evidence. The record simply does not support defendant's contention that the prosecutor elicited false and perjured testimony from Lieutenant Cottrell.

We also find no merit in defendant's assertion that Cottrell should not have been permitted to compare the burrs he observed on the clothing in the canvas bag and the burrs he observed near the Imperatore home. Such lay opinion testimony is permitted by N.J.R.E. 701 because it is based on the witness' perceptions and the subject matter of the testimony is not on a subject that is beyond the understanding of the average juror. <u>See</u> <u>State v. Johnson</u>, 120 N.J. 263, 293-95 (1990) (holding that lay witness can compare footprints and testify that footprints found at scene matched those of defendant); <u>state v. Labrutto</u>, 114 N.J. 187, 197 (1989) (concluding that investigating officer may testify as

14

to point of impact between two vehicles even though not
qualified in accident reconstruction).

(Resp. Ex. 4, Opinion of Appellate Division, at 32-33.)   The

Appellate Division rejected Petitioner's other claims without

discussion.

The U.S. Supreme Court has recognized the obligation of a

prosecutor to conduct a criminal prosecution with propriety and

fairness.

> He may prosecute with earnestness and vigor - indeed,
> he should do so.  But, while he may strike hard blows,
> he is not at liberty to strike foul ones.  It is as
> much his duty to refrain from improper methods
> calculated to produce a wrongful conviction as it is to
> use every legitimate means to bring about a just one.
> ...  Consequently, improper suggestions, insinuations,
> and, especially, assertions of personal knowledge are
> apt to carry much weight against the accused when they
> should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935).   "The line

separating acceptable from improper advocacy is not easily drawn;

there is often a gray zone."  United States v. Young, 470 U.S. 1,

7 (1985).

1.   Identification/Brady

An accused is entitled to due process protection against the

introduction of evidence of, or tainted by, unreliable

identifications elicited through unnecessarily suggestive

identification procedures.  See generally Manson v. Brathwaite,

432 U.S. 98 (1977) and cases cited therein.

> [R]eliability is the linchpin in determining the
> admissibility of identification testimony ... .   The

15

> factors to be considered ... include the opportunity of
> the witness to view the criminal at the time of the
> crime, the witness' degree of attention, the accuracy
> of his prior description of the criminal, the level of
> certainty demonstrated at the confrontation, and the
> time between the crime and the confrontation.  Against
> these factors is to be weighed the corrupting effect of
> the suggestive identification itself.

Manson, 432 U.S. at 114.  See also Simmons v. United States, 390

U.S. 377 (1968) (due process prohibits in-court identification if

pre-trial identification procedure is "so impermissibly

suggestive as to give rise to a very substantial likelihood of

irreparable misidentification").

In Brady v. Maryland, 373 U.S. 83, 87 (1963), the Supreme

Court held that "the suppression by the prosecution of evidence

favorable to an accused upon request violates due process where

the evidence is material either to guilt or to punishment,

irrespective of the good faith or bad faith of the prosecution."

See also Giglio v. United States, 405 U.S. 150, 154 (1972) ("A

finding of materiality of the evidence is required under

Brady."); United States v. Bagley, 473 U.S. 667, 682 (1985) (in

which the Supreme Court held that, regardless of request,

favorable evidence is material, and constitutional error results

from its suppression by the government, "if there is a reasonable

probability that, had the evidence been disclosed to the defense,

the result of the proceeding would have been different").  For

Brady purposes, there is no distinction between exculpatory and

impeachment evidence.  Kyles v. Whitley, 514 U.S. 419, 432 (1995)

16

(citing Bagley, 473 U.S. 667).

Nondisclosure merits relief only if the prosecution's failure "'undermines confidence in the outcome of the trial.'" Kyles v. Whitly, 514 U.S. 419, 434 (1995) (quoting Bagley, 473 U.S. at 678). There is, however, "no general constitutional right to discovery in a criminal case, and Brady did not create one." Weatherford v. Bursey, 429 U.S. 545, 559 (1977) (citing Wardius v. Oregon, 412 U.S. 470, 474 (1973) ("the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded ... .")).

Here, it is Petitioner's argument that undisclosed conversations between the police and Ms. Imperatore were impermissibly suggestive and tainted her later in-court identifications of Vassos and Kyriazis, which ultimately tied Petitioner to the robberies. Specifically, Petitioner contends that the identifications were tainted by police conversations with Ms. Imperatore in which they kept her abreast of what was going on in the case and provided her with police reports. In the same testimony in which she revealed the prior discussions with police, Ms. Imperatore admitted that she had no personal knowledge as to whether Petitioner had any involvement in the invasion of her home.

The allegedly undisclosed conversations were brought out during cross-examination of Ms. Imperatore at Petitioner's trial.

17

They do not reveal that police provided Ms. Imperatore with any information that would enable her to identify Petitioner or the co-defendants who invaded her home.  There is no indication of impermissibly suggestive procedures that would taint her later in-court identifications of Vassos and Kyriazis.  Moreover, to the extent the conversations cast doubt on the reliability of the identifications, that information was presented to the jury in Petitioner's trial.

In addition, there is no federal constitutional or statutory right to sequestration of witnesses.  See, e.g., Hammond v. Snyder, 2000 WL 1239993 (D.Del. Aug. 23, 2000); Mathis v. Wainwright, 351 F.2d 489, 489 (6th Cir. 1965), cert. denied, 384 U.S. 1009 (1966); King v. Elo, 2000 WL 791721 (E.D. Mich. May 25, 2000), aff'd, 36 Fed.Appx. 805 (6th Cir. 2002).

The Appellate Division's decision is neither contrary to nor an unreasonable application of clearly-established federal law, nor is it based upon an unreasonable determination of fact. Petitioner is not entitled to relief on this claim.

    2.   Knowing Use of Perjurious Testimony

"[T]he [Supreme] Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  U.S. v. Agurs, 427 U.S. 97,

103 (1976) (footnotes omitted) (citing, <u>inter alia</u>, <u>Mooney v. Holohan</u>, 294 U.S. 103 (1935) (deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice"); <u>Pyle v. Kansas</u>, 317 U.S. 213 (1942); <u>Napue v. Illinois</u>, 360 U.S. 264 (1959); <u>Giglio v. United States</u>, 405 U.S. 150 (1972); <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637 (1974)).

Here, the Appellate Division found that the record did not support a conclusion of deliberate deception by the prosecutor. That determination of the Appellate Division is neither contrary to nor an unreasonable application of clearly established federal law, nor is it based upon an unreasonable determination of the facts in light of the evidence presented.  Petitioner is not entitled to relief on this claim.

3.  <u>Other Alleged Misconduct</u>

Petitioner also complains that the prosecutor wrongfully asked excessive leading questions[3] and wrongfully introduced evidence of Petitioner's co-defendants' purchases of illegal drugs following the robberies[4] and Kyriazis's possession of

---

[3] Respondents contend that Petitioner has failed to exhaust his claim that he was deprived of due process by the prosecutor's excessive use of leading questions.  Because the claim is meritless, this Court will exercise its discretion to deny the claim without requiring exhaustion.  <u>See</u> 28 U.S.C. § 2254(b)(2).

[4] Respondents contend that Petitioner has failed to exhaust his claim that the prosecutor wrongfully introduced evidence about his co-defendants' purchases of illegal drugs the morning after the robbery solely for its prejudicial effect.  Because the

heroin at the time he and Petitioner were arrested.  Petitioner also complains that the prosecutor wrongfully elicited from Detective Cottrell expert testimony about the burrs found on clothing contained in a bag found in Petitioner's apartment. Finally, Petitioner complains about certain comments made during the prosecutor's summation, including a comment that Vassos was unemployed at the time of the robberies.

It is well-established that the violation of a right created by state law is not cognizable as a basis for federal habeas relief.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" (quoting Lewis v. Jeffers, 497 U.S. 764, 680 (1990))).  Accordingly, Petitioner cannot obtain relief for any errors in state law evidentiary rulings, unless they rise to the level of a deprivation of due process.  Estelle, 502 U.S. at 70 ("'the Due Process Clause guarantees fundamental elements of fairness in a criminal trial'") (quoting Spencer v. Texas, 385 U.S. 554, 563-64 (1967).  For a habeas petitioner to prevail on a claim that any evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial.  Keller v. Larkins, 251 F.3d 408, 413 (3d Cir.), cert. denied, 534 U.S. 973 (2001).

---

claim is meritless, this Court will exercise its discretion to deny the claim without requiring exhaustion.  See 28 U.S.C. § 2254(b)(2).

Defense counsel lodged numerous objections to the leading questions.  The trial court sustained some of the objections and allowed the leading questions in other instances.  There is no denial of a defendant's due process rights where a judge sustains objections to leading questions and correctly instructs the jury to disregard the questions and/or answers.  See, e.g., Turner v. Marshall, 63 F.3d 807, 818 (9th Cir. 1995), overruled on other grounds, Tolbert v. Page, 182 F.3d 677 (9th Cir. 1999).  Where a trial court permits leading questions, that is a state evidentiary ruling not subject to review in federal habeas corpus unless it rises to the level of a due process deprivation.  See, e.g., Government of Virgin Islands v. Dowling, 633 F.2d 660, 667 (3d Cir.), cert. denied, 449 U.S. 960 (1980); Wallace v. Lockhart, 701 F.2d 719, 725 (8th Cir.), cert. denied, 464 U.S. 934 (1983).

Here, the use of leading questions was not so egregious as to have denied Petitioner a fundamentally fair trial.  In addition, in its charge to the jury, the trial court reminded the jury that "[t]he mere fact that an attorney asks a question and asserts facts, or comments, or opinions in that question, in no way proves existence of those facts.  You only consider such facts, which in your judgment, have been proved by the testimony or from exhibits admitted into evidence by this Court."  (Resp. Ex. 32, Tr. of May 22, 2002, at 12.)

The Appellate Division rejected the argument that Lieutenant Cottrell was permitted improperly to testify as an expert about the similarity between burrs found on vegetation growing at the Imperatore home and burrs found on clothing located in Petitioner's apartment.  That state-law ruling is entitled to deference here.  It cannot be said that the Appellate Division's determination resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law.

Respondents acknowledge that the evidence of the co-defendants' drug purchases and possession shortly after the robberies was not relevant to the issues presented at Petitioner's trial.  (Answer at 21.)  Nevertheless, admission of this evidence was a minor error in the context of a trial in which there was substantial evidence of Petitioner's guilt.

Indeed, none of the evidentiary issues of which Petitioner complains, nor the prosecutor's summation, deprived Petitioner of a fundamentally fair trial.  Petitioner is not entitled to relief on the ground of prosecutorial misconduct or evidentiary error.

B.   Confrontation Clause

Petitioner contends that the trial court deprived him of his right of cross-examination under the Confrontation Clause of the Sixth Amendment to the U.S. Constitution when it permitted hearsay testimony to be introduced through the testimony of

22

Detective James Hunt,[5] Detective Frank Cox,[6] Simone DeMarco,[7] and

Jose Saavedra.[8]

The Appellate Division rejected Petitioner's challenges to

the admission of alleged hearsay testimony.

> Defendant next asserts that the trial judge erred
> in admitting hearsay testimony from Simone DeMarco,
> Trifon Nomidis, and George Roman. We disagree. We
> are satisfied that the statements were admissible against
> defendant under N.J.R.E. 803(b)(5), the co-conspirator
> exception to the hearsay rule, which permits the
> admission against a party of "a statement made at the

---

[5] On direct examination, Detective Hunt testified, "We
responded to 29 Spring Street in an effort to locate a green
Dodge Stealth with three occupants who were suspects of the armed
robbery." (Tr. of May 15, 2002, at 17-18.) In response to a
question by defense counsel, Detective Hunt testified that police
were looking for Kyriazis and the "driver" of the Stealth, who
had been identified as being involved in setting up the job.
(Tr. of May 15, 2002, at 57-59.) This latter testimony referred
to the hearsay statement of George Kyriazis, repeating
information conveyed to him by his brother, and Petitioner's co-
defendant, Nicholas Kyriazis.

[6] Detective Cox testified that Mr. Nomidis gave police a
statement in which he implicated persons other than Nicholas
Kyriazis in the robberies. (Tr. of May 8, 2002, at 44-45.)
Earlier in the trial, Mr. Nomidis had testified that Nicholas
Kyriazis had told him that the owner of the green Dodge Stealth
was the "mastermind" of the theft. (Tr. of May 7, 2002, at 52-
53.) On cross-examination, Mr. Nomidis admitted that he had no
personal knowledge of Petitioner's involvement in the robberies.
(Tr. of May 7, 2002, at 100-101.) Nicholas Kyriazis did not
testify at Petitioner's trial.

[7] Simone DeMarco testified that Mark Vassos admitted to her
that he, Petitioner, and Nicholas Kyriazis were involved in the
robberies. (Tr. of May 13, 2002, at 32-35.) She also testified
that Vassos was hiding from police. (Tr. of May 13, 2002, at
31.)

[8] Mr. Saavedra testified that Lieutenant Cullen told him
that the money Mr. Saavedra was holding for Simone DeMarco was
stolen. (Tr. of May 14, 2002, at 23.)

23

time the party and the declarant were participating in
a plan to commit a crime or civil wrong and the
statement was made in furtherance of that plan."

To come within the exception under N.J.R.E.
803(b)(5), three conditions must be satisfied: 1) the
statement must have been in furtherance of the
conspiracy; 2) the statement must have been made during
the course of the conspiracy; and 3) there must be
evidence, aside from the hearsay, of the existence of
the conspiracy and defendant's role in it.  State v.
Phelps, 96 N.J. 500, 509-10 (1984).  The evidence of
the conspiracy may be direct or circumstantial and can
take the form of hearsay, but it must be "substantial
enough to engender a strong belief in the existence of
the conspiracy and of defendant's participation."  Id.
at 511.

In her testimony, Simone DeMarco recounted what
co-defendant Mark Vassos told her about the robberies.
As we previously stated, Vassos sought DeMarco's help
in hiding from the police.  He admitted that he
participated in the robberies at the Imperatore home.
Vassos also described the roles that others played in
the robberies, including defendant.

The trial judge correctly found that Vassos'
statements to DeMarco were in furtherance of the
conspiracy.  When the statements were made, all of the
objects of the conspiracy had not been achieved and
Vassos was endeavoring to enlist DeMarco's aid in
avoiding detection and in concealing the money stolen
from the Imperatore home.  "A statement is considered
to have been made in the course of a conspiracy even
when the crimes have been completed, as long as all of
the conspiracy's objectives and goals have not yet been
met."  State v. James, 346 N.J. Super. 441, 458 (App.
Div.), certif. denied, 174 N.J. 193 (2002) (quoting
State v. Soto, 340 N.J. Super. 47, 62 (App. Div.),
certif. denied, 170 N.J. 209 (2001)).

Defendant argues that DeMarco's testimony
regarding Vassos' statements was inadmissible because
there was no evidence that DeMarco had any part in the
commission of the crimes.  But the hearsay exception
under N.J.R.E. 803(b)(5) is not limited to
conversations between co-conspirators.  State v.
Farthing, 331 N.J. Super. 53, 83 (App. Div.), certif.

denied, 165 N.J. 530 (2000). The exception under
N.J.R.E. 803(b)(5) applies to statements that are made
to convince a non-member of the conspiracy to act in
furtherance of the conspiracy. James, 346 N.J. Super.
at 457.

. . .

We are also convinced that there was overwhelming
evidence of defendant's role in the conspiracy, aside
from the challenged hearsay statements. That evidence
included the information provided by Madden and
Imperatore, the jewelry found in Nomidis' store, the
clothing that was found in the bag in defendant's
apartment, the pearls found in defendant's apartment
that matched jewelry taken from the Imperatore home,
the money found in defendant's car, Michael Viola's
testimony about the ride by the Imperatore home and
Jennifer Vassos' observations of defendant and the co-
defendants.

. . .

We turn to defendant's contentions respecting the
testimony of Detective Hunt, Detective Frank Cox and
Michael Viola.

Detective Hunt testified that the police were
dispatched to 29 Spring Street to find the green Dodge
Stealth. Hunt said that the officers believed the
driver was involved "in setting the job up." Defendant
asserts that the testimony was hearsay and its
admission was in contravention of the [New Jersey]
Supreme Court's decision in State v. Bankston, 63 N.J.
263 (1973). There, the Court held that a police
officer may recount statements by a non-testifying
witness to explain why the officer approached a suspect
or went to the scene of a crime, but the officer may
not provide testimony about statements of a non-
testifying witness if the logical implication to be
drawn from the testimony leads the jury to believe that
the witness has given evidence of defendant's guilt.
Id. at 268.

Although Detective Hunt's testimony was not
consistent with the limitations imposed by Bankston,
the judge correctly overruled the objection to the
testimony because it had not been elicited by the

25

prosecutor but rather was in response to a question
from defense counsel.  The judge nevertheless
instructed the jury to disregard Hunt's assertion that
the officers were looking for the owner of the green
Dodge Stealth.  The jury is presumed to have followed
the court's instructions.  State v. Manley, 54 N.J.
259, 271 (1969); State v. Pleasant, 313 N.J. Super.
325, 335 (App. Div. 1998), aff'd, 158 N.J. 149 (1999).
In our view, the judge's instruction cured any
prejudice to the defendant from Hunt's testimony.

Defendant also argues that the trial judge erred
in admitting testimony from Detective Cox who stated
that, at the time he arrested Nomidis, he told Nomidis
that he could be charged with perjury if Nomidis did
not tell the truth.  When he was asked what information
Nomidis had provided to the police, Cox testified that
Nomidis said that Kyriazis had arrived at his store on
June 2, 1998.  Defense counsel objected and a sidebar
conference was conducted.  Detective Cox then testified
that Nomidis had given a stenographic statement in
which he implicated individuals other than Kyriazis.

The State concedes that Detective Cox's testimony
as to what Nomidis asserted in his statement was
hearsay.  Nevertheless, we are convinced that the
admission of this evidence was not reversible error.
Nomidis had previously testified in the trial that
Kyriazis had implicated others in the Imperatore
robberies.  Detective Cox's testimony was cumulative
and, in our view, did not prejudice defendant.

(Resp. Ex. 4, Opinion of Appellate Division, at 20-24, 28-30.)

The Appellate Division did not specifically address the challenge

to Mr. Saavedra's testimony.

The Sixth Amendment's Confrontation Clause provides that,

"In all criminal prosecutions, the accused shall enjoy the right

... to be confronted with the witnesses against him."  Recently,

the Supreme Court has traced the historical roots of the

Confrontation Clause and has distinguished the application of the

Confrontation Clause to different types of hearsay evidence.   <u>See</u>

<u>generally</u> <u>Crawford v. Washington</u>, 541 U.S. 36 (2004).

> Where nontestimonial hearsay is at issue, it is
> wholly consistent with the Framers' design to afford
> the States flexibility in their development of hearsay
> law -- as does [<u>Ohio v. ]Roberts</u>, [448 U.S. 56, 66
> (1980),] and as would an approach that exempted such
> statements from Confrontation Clause scrutiny
> altogether.  Where testimonial evidence is at issue,
> however, the Sixth Amendment demands what the common
> law required:  unavailability and a prior opportunity
> for cross-examination.  We leave for another day any
> effort to spell out a comprehensive definition of
> "testimonial."  Whatever else the term covers, it
> applies at a minimum to prior testimony at a
> preliminary hearing, before a grand jury, or at a
> former trial; and to police interrogations.  These are
> the modern practices with closest kinship to the abuses
> at which the Confrontation Clause was directed.

<u>Crawford</u>, 541 U.S. at 68 (footnote omitted).[9]  <u>See also</u> <u>Davis v.</u>

<u>Washington</u>, 126 S.Ct. 2266 (2006) (statements taken by police in

the course of an interrogation are "nontestimonial," and are not

subject to the Confrontation Clause, when they are made under

circumstances objectively indicating that the primary purpose of

the interrogation is to enable police assistance to meet an

ongoing emergency; statements taken by police in the course of

interrogation are "testimonial," and subject to the Confrontation

---

[9] In <u>Ohio v. Roberts</u>, 448 U.S. 56, 66 (1980), the Supreme
Court held that the Confrontation Clause does not preclude the
admission of an unavailable witness's hearsay statement if it
bears "adequate indicia of reliability."  Under <u>Roberts</u>, a
hearsay statement contains such "adequate indicia of reliability"
if it falls within a "firmly rooted hearsay exception" or if it
bears "particularized guarantees of trustworthiness."  448 U.S.
at 66.

Clause, when the circumstances objectively indicate that there is no ongoing emergency and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution). The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford, 541 U.S. at 59 n.9 (citing Tennessee v. Street, 471 U.S. 409 (1985)).

The Court of Appeals for the Third Circuit has not addressed the issue whether Crawford applies retroactively. Most Circuit Courts, however, have held that it does not, on the rationale that newly promulgated rules of criminal procedure generally do not apply retroactively to cases on collateral review. See generally Espy v. Massac, 443 F.3d 1362 (11th Cir. 2006) (Crawford rule does not apply retroactively); Dorchy v. Jones, 398 F.3d 783, 788 (6th Cir. 2005) (same); Murillo v. Frank, 402 F.3d 786, 790 (7th Cir. 2005) (same); Mungo v. Duncan, 393 F.3d 327, 336 (2d Cir. 2004) (same), cert. denied, 544 U.S. 1002 (2005); Brown v. Uphoff, 381 F.3d 1219, 1227 (10th Cir. 2004) (same), cert. denied, 543 U.S. 1079 (2005). Contra Bockting v. Bayer, 399 F.3d 1010, as amended, 408 F.3d 1127 (9th Cir. 2005), cert. granted, 126 S.Ct. 2107 (2006).

In any event, Confrontation Clause errors are subject to harmless error analysis. See U.S. v. Reynolds, 171 Fed.Appx.

961, 966, 2006 WL 760291, *4 (3d Cir. 2006) (citing Delaware v. VanArsdall, 475 U.S. 673, 684); United States v. Al-Sadawi, 432 F.3d 419, 426 (2d Cir. 2005)).  See also U.S. v. Arriola-Perez, 137 Fed.Appx. 119, 133, 2005 WL 1463502, *11 (10th Cir. 2005), cert. denied, 126 S.Ct. 1024 (2006).

Prior to the Crawford opinion, the Court of Appeals for the Third Circuit had held that, under certain circumstances, police officers may reveal information received out-of-court for the limited purpose of establishing background or context for the officers' actions.  See United States v. Sallins, 993 F.2d 344 (3d Cir. 1993).  At the same time, the Court noted the potential for abuse.

> "In criminal cases, an arresting or investigating officer should not be put in the false position of seeming just to have happened upon the scene; he should be allowed some explanation of his presence and conduct.  His testimony that he acted 'upon information received,' or words to that effect, should be sufficient.  However, cases abound in which the officer is allowed to relate historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the ground that he was entitled to give the information upon which he acted. The need for the evidence is slight, the likelihood of misuse great."

Sallins, 993 F.2d at 346 (quoting 2 McCormick on Evidence § 249, at 104 (4th ed. 1992)).  See also United States v. Lopez, 340 F.3d 169 (3d Cir. 2003) (again recommending the use of "general terms" to provide background for police activities); United States v. Price, 2006 WL 1795108 (3d Cir. June 30, 2006) ("Police

29

officers are permitted under Sallins to explain the background

context for their arrival at a scene. When the explanation

cannot be effected without relating some contents of the

information received, Sallins does not prohibit admission of such

details.").

Here, as noted by the Appellate Division, Detective Hunt's

testimony regarding the reason for surveillance at 29 Spring

Street was elicited by the defense but was followed,

nevertheless, by a curative instruction.

> THE COURT: The jury should disregard any comments by
> this witness if it was heard that way that he was
> looking for the owner of a green Dodge Stealth. His
> testimony was he was looking for a Dodge Stealth and
> suspects.

(Tr. of May 15, 2002, at 83.) Several witnesses previously had

testified that a green Dodge Stealth was involved in the

robberies. (Tr. of May 15, 2002, at 79-80.) As found by the

Appellate Division, any Confrontation Clause error that may have

occurred was harmless.

The Appellate Division determined that the non-testimonial

hearsay introduced through Simone DeMarco met state-law

evidentiary rules for the admission of hearsay testimony. Thus,

there was no violation of the Confrontation Clause with respect

to Ms. DeMarco's testimony. In addition, with respect to

Detective Cox's testimony repeating the statements of Mr.

Nomidis, Mr. Nomidis testified, so there was no Confrontation

Clause violation.  In any event, the determination of the
Appellate Division that Detective Cox's testimony was cumulative
and harmless is entitled to deference here.  Finally, Petitioner
objects to the hearsay testimony of Jose Saavedra quoting
Lieutenant Cullen that the money held for Ms. DeMarco was stolen.
At trial, the prosecutor stated that the challenged statement was
not offered to prove the matter asserted, but to explain Mr.
Saavedra's subsequent return of the money to police.  (Tr. of May
14, 2002, at 23-25.)  Thus, the testimony was not hearsay, as it
was not offered to prove that the money was stolen.  In any
event, there was ample other evidence that the money was stolen,
and the testimony involved money given to DeMarco by co-defendant
Vassos, not by Petitioner.

    In light of the other evidence of Petitioner's guilt, any
Confrontation Clause errors were harmless.  Petitioner is not
entitled to relief on this ground.

C.   Speedy Trial

    Almost four years elapsed between Petitioner's arrest and
his trial.  He contends that this delay in bringing him to trial
violated his Sixth Amendment right to a speedy trial.  The
Appellate Division rejected this claim.

> Defendant contends that his right to a speedy
> trial was violated and, therefore, his convictions
> should be reversed.  The right to a speedy trial is
> recognized under the Sixth Amendment to the
> Constitution of the United States and Article I, para.
> 10 of the New Jersey Constitution.  State v. Long, 119

31

N.J. 439, 469 (1990) (citing <u>United States v.</u>
<u>MacDonald</u>, 456 U.S. 1, 7, 102 S.Ct. 1497, 1501, 71
L.Ed.2d 696, 703 (1982)).  The guarantee of a speedy
trial is intended "to minimize the possibility of
lengthy incarceration prior to trial."  <u>Id.</u> at 470.
The factors to be considered in determining whether a
defendant's right to a speedy trial has been abridged
are: 1) the length of the delay; 2) the reasons for the
delay; 3) whether and how the defendant asserted his
right to a speedy trial; and 4) the prejudice to the
defendant caused by the delay.  <u>Barker v. Wingo</u>, 407
U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 117
(1972); <u>Long</u>, <u>supra</u>, 119 N.J. at 470.  None of the four
factors is a "necessary or sufficient condition to a
finding of a deprivation of the right to a speedy
trial.  Rather, [they are] to be treated as related
factors to be considered with such other circumstances
as may be relevant."  <u>State v. Szima</u>, 70 N.J. 196, 201
(1976), <u>cert. denied</u>, 429 U.S. 896, 97 S.Ct. 259, 50
L.Ed.2d 180 (1976).

The right to a speedy trial attaches on arrest.
<u>State v. Douglas</u>, 322 N.J. Super. 156, 170 (App.Div.),
<u>certif. denied</u>, 162 N.J. 197 (1999) (citing <u>Dillingham</u>
<u>v. United States</u>, 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d
205 (1975)).  Defendant was arrested on June 2, 1998.
His trial did not commence until April 2002.  We agree
with defendant that the delay was lengthy.  <u>See</u> <u>State</u>
<u>v. May</u>, 362 N.J. Super. 572, 597 (App. Div. 2003)
(twenty-five month delay facially weighs in defendant's
favor).  But we are satisfied that defendant's right to
a speedy trial was not violated in the circumstances
presented here.

Defendant's trial was delayed for valid reasons.
This was a relatively complex matter, involving
multiple defendants, numerous charges and a variety of
witnesses.  When a criminal matter involves some
complexity, delay is to be expected.  <u>See</u> <u>State v.</u>
<u>Marcus</u>, 294 N.J. Super. 267, 194 (App. Div. 1996),
<u>certif. denied</u>, 157 N.J. 543 (1998) (holding that two
and one-half year delay in a complex matter did not
deprive defendant of speedy trial).

Moreover, defendant and his co-defendants filed
substantial motions to suppress evidence.  The judge
held hearings on these motions between September 1999
and October 2000.  Because defendants sought the

32

suppression of evidence, and because the judge was required to give careful consideration to those applications, this delay was attributable to defendants.  A delay caused by a defendant will not weigh in favor of a finding of a speedy trial violation.  Long, supra, 119 N.J. at 470.

In addition, the co-defendants were tried separately.  Vassos' trial began on July 11, 2001 and concluded July 26, 2001.  Kyriazis' trial began on January 7, 2002 and concluded on February 4, 2002.  Defendant's trial followed.  Because the charges against defendant, Kyriazis and Vassos required testimony from essentially the same witnesses, the defendants could not be tried at the same time.  Although the prosecutor's apparent election to try defendant last as a matter of trial strategy does not weigh against defendant, the fact remains that all three trials could not proceed simultaneously and some prioritization was required.

Defendant also delayed in asserting his right to a speedy trial.  Although defense counsel stated during the hearing on the suppression motions that defendant was in jail and counsel asked the judge to start defendant's trial as soon as possible, defendant did not make a formal motion asserting his right to a speedy trial until September 2001, when he sought a peremptory trial date or dismissal of the charges.  Thus, defendant did not formally assert his right to a speedy trial until more than three years after his arrest in June 1998.  The delay by defendant in asserting the right weighs against his claim.  May, supra, 362 N.J. Super. at 598.

Furthermore, although defendant was incarcerated from the time of his arrest, there is no claim that his incarceration was particularly oppressive.  Nor is there any claim that the delay impaired defendant's ability to defend himself against the charges.  Barker, supra, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118.  Therefore, we are not convinced that defendant was unduly prejudiced by the delay.

Considering all of the relevant factors, we are convinced that defendant's right to a speedy trial was not violated.

(Resp. Ex. 4, Opinion of Appellate Division, at 17-20.)

Here, the Appellate Division correctly identified the applicable Supreme Court standard for evaluating Petitioner's speedy trial claim.  The decision of the Appellate Division was neither contrary to nor an unreasonable application of clearly established federal law, nor was it based upon an unreasonable determination of the facts.  Petitioner is not entitled to relief on this claim.

### IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

34

## V.   CONCLUSION

For the reasons set forth above, the Petition must be denied.   An appropriate order follows.

Peter G. Sheridan
United States District Judge

Dated: 11/2/06

35